## DILLON v. TRADERS & GENERAL INS. CO.

No. 1886.

Court of Appeal of Louisiana.
First Circuit.

Oct. 5, 1938.

S. S. Reid, of Amite, for appellant.

Taylor, Porter & Brooks, of Baton Rouge, for appellee.

Lewis R. Graham, of New Orleans, for interveners.

OTT, Judge.

The suit is to recover compensation for the death of Obie Dillon, a colored man, who died as a result of an injury received by him on March 5, 1937, while loading logs for the Kent Piling Company, Inc. The suit is against the insurance carrier of the employer only. There is no dispute about the injury and death of Obie Dillon in the course of his employment, and the fact that he was receiving wages of $12 per week. Plaintiff claims compensation for 300 weeks at $3.90 per week, being 32½ per cent of the weekly wage.

Plaintiff alleges that she was married to the deceased on the 23d day of August, 1923, and continued to live with him until the date of his death; that, at the time she married the deceased, and prior and subsequent thereto, said Obie Dillon had told her that he had been divorced from a former wife, Janie Dillon; that she relied on said statement and believed it to be true; that she married the deceased in good faith and lived with him in ignorance of the fact that he was not divorced from said former wife, and she did not know that the deceased had not been divorced from his former wife until after his death, when she ascertained that he had not been divorced from her until June, 1929. She therefore claims all the rights of a putative wife under Articles 117 and 118 of the Civil Code, including the right to collect compensation for the death of the deceased employee. Jones v. Powell Lumber Company, 156 La. 767, 101 So. 135.

The deceased had two children by a predeceased wife, but they were both over eighteen years of age and not entitled to compensation. The father and mother of the deceased employee filed an intervention in the suit in which they joined with the defendant in denying that plaintiff married Obie Dillon in good faith, and alleged that plaintiff was not the legal or putative wife of the deceased employee and is not entitled to compensation on account of his death. They alleged that they were wholly dependent on their deceased son for support, and asked for compensation to each of them in the sum of $4.14½ per week for 300 weeks, or the sum of $8.29 to both of them as surviving parents for 300 weeks.

The trial court found that plaintiff did not marry the deceased in good faith, and denied her claim for compensation. He allowed the father and mother compensation in the minimum amount of $3 per week to both of them for 300 weeks, or the total sum of $900. The plaintiff and the defendant have both appealed. One of the interveners, the father of the deceased employee, died on

February 7, 1938, and a motion has been filed in this court to make his heirs parties. The other intervenor and the substituted heirs have filed in this court an exception of no cause or right of action, and have answered the appeal asking that the compensation to the mother be increased to $3.90 per week for 300 weeks, and that compensation to the deceased father be increased to the same rate up to the date of his death, and, in the alternative, in case it is held that only the minimum of $3 per week is allowed, that said minimum be allowed the surviving mother for the full 300 weeks, and the minimum be allowed the heirs of the deceased father up to the time of his death.

 The exception of no cause or right of action is based on the allegation in the petition that deceased told plaintiff at the time of their marriage, and prior thereto, that he had been divorced from a former wife and that she relied on said statement and believed it to be true when she married the deceased. It has been held in some cases that the statement by the man to the woman that he has a living wife but has a divorce from her is not sufficient in itself to create a presumption of good faith on the part of the woman where she makes no further effort to ascertain the truth of the statement, and where there are no other facts and circumstances to lead her to believe that the man actually has a divorce. Succession of Taylor, 39 La.Ann. 823, 2 So. 581; Thomas et al. v. Thomas et al., 144 La. 25, 80 So. 186; Prieto et al. v. Succession of Prieto, 165 La. 710, 115 So. 911.

However, in other parts of the petition allegations are made to the effect that when plaintiff married the deceased she was in perfect good faith, and she continued to live with him after the marriage in ignorance of the fact that he had not been divorced from his prior wife. Whether or not her good faith before and after her marriage to the deceased depended solely on his statement that he was divorced from his prior wife does not appear from the petition. In establishing her good faith she had a right to show the facts and conditions as they existed at the time of her marriage, as well as prior and subsequent thereto. We think the rule announced in the above cases is more a rule of evidence, or a means of weighing the evidence, than it is a rule of law or legal presumption. For these reasons, the exception is overruled.

There are three questions presented in the case: (1) whether or not plaintiff is the putative widow of the deceased employee; (2) if she is not, then whether or not the intervening father and mother were either wholly or partially dependent on the deceased for support at the time of his injury and death; and (3) if they were so dependent, the amount of compensation they were entitled to receive.

 (1) A greater amount of caution is required of a woman in order to give her the status of a putative wife where she marries a man who, to her knowledge, has a living wife, than there is where the woman does not know, or have reasonable cause for knowing that the man has a living wife. In the former case, the bare statement of the man that he has a divorce is not sufficient to constitute good faith on her part, while in the other case, if the woman does not know that the man has a living wife, she is not called upon to make an investigation to ascertain if there exists any legal impediment to her marriage to him.

 Plaintiff not only alleged in her petition that Obie Dillon told her before the marriage that he had been divorced from his former wife, Janie Dillon, but in a written statement made by her to an insurance adjuster two months after the death of Dillon, she said that she had known him about a year and eight months before she married him; that she knew at the time she married him that he had been married to Fanny Johnston by whom he had two children and who had died about 1918; that after she and Obie were practically engaged, he told her about Janie Vernon being his wife, but that he had separated from her about four years before; that she and Obie had not gotten married at that time; that she was then living near Tickfaw and Obie was living in Amite, about ten miles distant; that in about ten months they went to Magnolia, Mississippi, and were married there. She further says in this statement that before they got married, Obie came to where she lived and told her that he had "put in" for a divorce, and that Mr. Polité (referring to Honorable Hypolite Mixon, now one of the judges of the district court, then a practicing attorney) said to go ahead as it would be alright as Janie could do nothing to Obie; that when she married Obie she expected the divorce to go on through; that she knew the divorce was not finished, but Mr. Polité said he had it fixed so it would be finished.

It is obvious that plaintiff knew before her marriage to Obie that he was then married to Janie Dillon, unless she is mistaken in the allegations of her petition, and unless the statement which she gave the insurance adjuster was so twisted and manufactured by him in writing it down from her dictation as to entirely misrepresent what she said at the time. Her petition was drawn by a reputable attorney, and it is to be presumed that he secured the information from her on which to base the allegations in the petition. There is nothing in the record to show that the allegations were made through error or mistake of fact.

Ordinarily, a statement made by an ignorant and unsuspecting negro woman would not be given a great deal of weight in discrediting her sworn testimony, yet where, as in this case, her statement is born out at least in part by the solemn declarations in her petition, we cannot entirely ignore it. In fact, we hardly see how the adjuster could have manufactured some of the significant expressions in the statement, such as "put in for a divorce", and referring to the attorney as Mr. Polite. These are characteristic traits of the colored race. The adjuster who took the statement is a young attorney and testified that he wrote down the statement on a typewriter as it was given by plaintiff. The trial judge says that he was impressed with this young man, and we agree with him that there is no proof of any fraud, duress or undue influence used in obtaining the statement.

Plaintiff testified on the stand that she did not know Obie was married until two or three years after she married him, and she learned of it when Obie told her that he was married to Janie, but had gotten a divorce. Were this testimony not in direct conflict with the allegations of her petition and what she said in the signed statement, we would be inclined to give her the benefit of the doubt and accord her good faith in her marriage to Obie.

Plaintiff knew Obie Dillon for more than a year before she married him, and went with him for eight or nine months. There is some testimony to the effect that during this time, plaintiff and Obie lived together near Amite, and this was the cause of the separation between Obie and Janie. All during the time that plaintiff and Obie were going together, Janie lived only a few miles from them and the brothers of Obie saw and talked with plaintiff frequently. It is

hardly probable, as the trial Judge says, that plaintiff did not know about Janie and the fact that she was the wife of the man that she was going with and subsequently married.

Plaintiff's father would not consent to her marriage to Obie, she says because she was the only girl at home to help him, and he says because she was too young. She was about sixteen years old at the time. It is also a little significant that plaintiff and Obie went to Magnolia, Miss., to get married, and soon thereafter returned to Tangipahoa Parish to live. While the objection of the girl's father could have had something to do with their decision to go to Magnolia to marry, yet it is not unreasonable to assume that the knowledge that they both had of the near presence of another wife had something to do with their plans to go out of the parish to consummate the marriage.

To show that the courts are liberal in construing the good faith of a woman who marries a man without knowing that he has a living wife from whom he is not divorced, counsel for plaintiff cites and relies on the following cases as pertinent: Clendenning v. Clendenning et al., 3 Mart.N.S., 438; Patton et al. v. Cities of Philadelphia & New Orleans, 1 La.Ann. 98; Harrington v. Barfield et al., 30 La.Ann. 1297; and Howard v. Ingle et al., La.App., 180 So. 248.

But an examination of these cases shows that the court found from the facts that the second wife did not know that the man whom she married had a living wife from whom he was not divorced, whereas, in the present case, the plaintiff did know before her marriage to Obie Dillon that he had married Janie Dillon. This being the situation, we think, as did the trial judge, that the cases cited in discussing the exception, have peculiar application here.

In the case of Miller et al. v. Wiggins, Sheriff, et al., 149 La. 720, 90 So. 109, referred to in argument, the court found as a fact that the second wife knew that the man she married had a living wife, but the court also found in that case that the man had secured a separation from bed and board, and the second wife as well as her father, brother-in-law and friends actually believed this document was a divorce. All the parties were ignorant and could not read or understand the judgment of separation.

The courts are very liberal in upholding the good faith of a spouse who marries an-

other who is already married. We are in full accord with this rule, and we think a liberal construction should be given the testimony to show the good faith of the woman, especially, as in this case, where she is a young, ignorant and immature negro girl. However, the presumption arising as to the good faith of the wife raises a question of fact, and, like all other issues involving questions of fact, the findings of the trial judge are entitled to great weight. We cannot say that the trial judge is in error in his finding of fact on this point in the case.

■ (2) On the question of dependency of the parents on the deceased, we think the trial judge was justified in his finding that the deceased contributed as much as $2.50 per week to their support. The father and mother and one brother of the deceased testified to more or less regular payments, varying from $5 every two weeks to $10 per month. The only denial of these contributions was made by the plaintiff, and on the question of the credibility of the witnesses and the weight to be given their testimony on this point, we must rely very largely on the findings of the trial judge. We see no reason to disturb his findings, and agree with him that the parents were at least partially dependent on the deceased for support.

(3) The compensation for partial dependency under the first paragraph of subsection 2 of section 8 of Act 20 of 1914, as amended by Act No. 242 of 1928, is in proportion to whole dependency as the amount actually contributed by the employee for the previous year bears to his earnings for that year. At $2.50 per week, the deceased contributed to the support of his parents the previous year the sum of $130 and his earnings for that year were $624. Had the parents been wholly dependent, their compensation would have been 65 per cent of $12 per week, or $7.80; consequently, their compensation for partial dependency would be $^{130}\!/_{624}$th of $7.80, or $1.62 per week. However, the minimum compensation fixed under the act is $3 per week, and the court correctly fixed their joint compensation at $3 per week for 300 weeks.

■ Counsel for the parents contends that the minimum should apply to the compensation of the father and the mother separately, as their claims are made separately, and are direct claims under the law as it now stands. It is true that each parent is entitled to 32½ per cent of the weekly wages where wholly dependent under paragraph 7 subdivision (E) of said subsection 2 of Section 8, where either father or mother is wholly dependent, and 65 per cent where both are dependent. Under paragraph (D) of subsection 2 of said section 8, it is provided that if there is no one wholly dependent but more than one person partially dependent, so much of the death benefit as each is entitled to under the act shall be divided among them according to the relative extent of their dependency. So far as the record shows, the parents in this case were equally dependent on the deceased. The minimum compensation is used to raise their joint compensation to $3 per week, and they each had an equal interest in that allowance. The minimum is applied on the whole claim, otherwise, if there were several partial dependents and each were given the minimum, the total compensation would exceed that for total dependency.

■ Therefore, the defendant owes the surviving mother one half of this minimum compensation for a period of 300 weeks, and owes the heirs of the deceased father the other half of the minimum compensation from March 5, 1937 to the date of his death, February 7, 1938, a total of 48 weeks, or $72. When the father died, his compensation ceased, but his death did not affect the compensation due the mother.

For the reasons assigned, it is ordered that the judgment be amended and recast, so as to award the heirs of the deceased father, Isaiah Dillon, accrued compensation in the sum of $72, with legal interest on the weekly payments of $1.50 for 48 weeks, beginning March 12, 1937, respectively; and awarding the surviving mother, Sophie Dillon, compensation in the sum of $450, payable at the rate of $1.50 per week, beginning March 12, 1937, with legal interest on the weekly payments from their respective due dates. The amendment of the judgment having become necessary only because of the death of one of the interveners, the cost of the appeal, as well as the cost in the lower court, will be taxed against the defendant in the suit.